HUTCHINS HAPGOOD, executor of J. GROUT, appellee *vs.* JOHN
JENNISON et al. heirs of said GROUT, appellants.

That the executor is entitled to allowance for what the estate was holden to pay for
taxes; he having so paid as to procure a discharge of the same; though it may not
appear, many years after, how he paid the same.

That the executor may be allowed a reasonable *per centage* for receiving payments in
neat stock, and converting the same into money; though he never kept any exact
account of the expenditures and loss in the same.

Though the estate might have been settled much sooner, the executor does not, by
his neglect, forfeit all compensation for his actual services, faithfully performed, and
his necessary expenditures.

That the heirs, if they elect to treat the executor as trustee of the estate of the deceas-
ed, which came to him by purchase, after the same was bid in for him, must be con-
tent to have him account with reference to the value of what he yet holds, as well
as the avails of what he has re sold.

That jurisdiction of the probate court in this state; being secondary, all expenditures,
not properly arising from the care of the property here, must be adjusted in the pro-
bate court where the will was first proved.

That the executor must not be made liable for the amount of lands of the testator, bid
off by him, but lost through want of title in the testator. He, also, must be allowed
the cost of defending or supporting such titles.

That the executor must not be allowed for an outstanding claim, now [in suit, and not
paid by him.

That, in this case, of an estate in wild lands, the executor must pay six *per cent.* inter-
est, only, upon the demands for which he accounts. Had it been a monied estate,
and he used the same instead of paying it to the heirs, he must have paid compound
interest, with annual rests.

*Hapgood*, the executor, procured a probate of the will of the de-
ceased, in the fall of 1807, in the state of *Massachusetts*, where the
family of the deceased lived; *Grout*, himself, having been a conside-
rable time in *Lunenburgh*, in the probate district of *Essex*, where he
claimed to own, and had the care of, a great many rights of wild
land. The executor, soon after the probate of the will, produced
a copy of it and the probate thereof, and filed the same in the
said probate district of *Essex*, and took administration according
to the provisions of our statute. He had made several partial
settlements before the probate court in *Massuchasetts*; but none
in this state. A proceeding instituted by the heirs, set aside his
settlement there; and he caused the heirs to be cited before the
probate court in the district of *Essex*, and had his account al-
lowed : from which allowance the heirs appealed to the Supreme
Court. There had been many vendue sales of these lands in *Lu-
nenburgh* for taxes; and two sales each of a part, by the execu-
tor himself, to raise money to pay the debts; at the last of which,
being in 1814, there would have appeared no necessity for the
sale had there been no error in the rendition of his accounts in
*Massachusetts*. At all these sales the title to a great portion of

Essex,
July,
1829.
————
Hapgood.
vs.
Jennison et al.

the lots was soon conveyed to *Hapgood*, being probably bid in for him.   And he rendered an account of the sales before the probate Court in *Massachusetts*, making himself debtor for the amount of the sales ; though payment was not made forthwith; but notes taken, and many of them payable in neat stock, at a period then future.   Previous to the rendering of his present account, he had sold many of these lots at a price. greater than the sum he paid for them.   The heirs now elected to treat him as their trustee in these purchases, and called upon him to account for the avails of his sales and re-sales.

Among the many points argued by counsel, and decided by the Court, a small portion in number involve questions of sufficient importance in principle, to require a publication, the others having turned upon the weight of evidence.

The principal facts, connected with the most important questions, are sufficiently plain, by the allusions in the opinion of the Court, not to need a previous recital.

*Mr. Bigelow, for the appellants.*—The following are points and authorities, upon which the counsel for the appellants rest some portions of the cause.

By the common law it is not essential to the validity of the deed for the conveyance of land, that it be attested by subscribing witnesses.—2 *Bla. Com.* 307, 378.—*Comyn's Dig. Fait, (B.* 4.) —4 *Cruise's Dig. p.* 31, *(tit.* 32, *ch.* 2, *s.* 60.

Where there are two or more executors of a will, the acts of one are the acts of all ; and a deed executed by one executor, will be good and valid, although it be prepared as a deed of all.— *Bac. Abr. tit. Executors and Adm'rs, (D.* 1.)—*Comyn's Dig. tit. Administration, (B.* 12.)—*Hammond's Dig. p.* 294.— *Simpson* vs. *Gutteridge,* 1 *Mad. Rep.* 609.—*Cutler* vs. *Whittemore,* 10 *Mass. Rep.* 442.—12 *Id.* 137, *Adams* vs. *Bean.*

Where lands have been sold and conveyed by executors or administrators, the necessary authority to sell, as well as a compliance with the requisitions of the law in making the sale, will be presumed, after a considerable lapse of time, especially if the deed recites every thing as done, which the law required to be done.   So in case of titles derived under a collector's sale for taxes : if the transaction be an old one, it will be presumed that all the proceedings were legal.—3 *Stark. Ev.* 1250, *et seq.*— *Gray* vs. *Gardner,* 3 *Mass. R.* 399.—*Knox* vs. *Jenks,* 7 *Id.* 488.—*Colman et al.* vs. *Anderson,* 10 *Id.* 105.—*Perkins* vs. *Fairfield,* 11 *Id.* 227.—*Pejepscott Prop's* vs. *Ransom,* 14 *Id.* 145.—*Blossom* vs. *Cannon,* *Id.* 177.

Essex,
July,
1829.

Hapgood
vs.
Jennison et al.

If an executor or other trustee buys in the trust estate, it is at the option of *cestui que trust* to affirm or disaffirm the sale ; but it cannot be avoided by the trustee at his option.—*Jackson* vs *Van Dalpsen*, 5 *Johns. Rep.* 47.—*Sheldon* vs. *Sheldon*, 13 *Id.* 222. *Jackson* vs. *Walsh*, 14 *Id.* 415.

If a trustee buy in the trust estate, and afterwards sell it at a profit, he may be compelled to account for the proceeds of the second sale. And if he should sell part at a profit, the court will open the sale, at the request of the *cestui que trust*, as to the parts not sold, and hold the trustee to account for the parts sold.—*Davone* vs. *Fanning*, 2 *Johns. Ch. Rep.* 252, *and authorities there cited.*—*Hammond's Dig.* 300, 644–5–6.

A trustee shall not be permitted to gain any benefit by any act done by him as trustee, but the benefit shall enure to the *cestui que trust.*—*Green* vs. *Winter*, 1 *Johns. Ch. Rep.* 36, *(42.)* —*Hammond's Dig.* 300, 644–5–6.

It is an established rule in chancery, that an executor or other trustee shall have no compensation for his care and trouble ; because, on such pretences, if allowed, the trust might be burdened with unnecessary charges. The rule is adopted with a view to close the door against the temptation to commit abuses and frauds. —2 *Mad. Ch.* 131,—*Manning* vs. *Manning*, 1 *Johns. Ch. Rep.* 532–3–4.

If a trustee receive the trust funds and appropriate them to his own use, or, if he have unreasonably delayed to render an account, or, have been guilty of fraud or gross negligence in the execution of the trust, he is chargeable with compound interest upon the funds, and with more, if he have made more by the use of the money. —2 *Mad. Ch.* 117, 120, 121.—*Schieffelin* vs. *Stewart*, 1 *Johns. Ch. Rep.* 620.—*Fay* vs. *Howe*, 1 *Pick.* 527.—*Robbins* vs. *Hayward et al. Id. (in note.)*—*Jennison et al.* vs. *Hapgood*, *(M. S. Rep.)*

If a trustee be guilty of fraud, or a wilful breach of trust, he shall make satisfaction to the utmost.—*Hart* vs. *Ten Eyck*, 2 *Johns. Ch. Rep.* 116, *(107.)*

*Mr. Cushman, for the appellee,* contended, That there was no fraud in this case, on the part of the executor, and no neglect but what is well accounted for by the peculiar circumstances of the estate, at the time of the decease of the testator—That the property in this state was all wild lands, very unsaleable, most of them very poor, and the title of the testator, commencing with deeds probably forged, and, at best, but imperfectly executed, required to be strengthened by vendue titles—That the testator had all his

Essex,
July,
1829.

Hapgood
*vs.*
Jennison et al.

lands sold for taxes, and procured deeds of the same to himself. Of some he had only vendue titles; and those vendues defective. Of some he had only the deed from one of the executors of one *Page*; when in fact there were two executors, and the deed drawn for both to sign; and nothing could ever be found of any authority for either of them to act in this state, till the copies from the probate records of *Orange* county, now produced by the appellants—That the executor of *Grout* has been obliged to prolong the settlement, and procure vendue titles to the lands, to confirm the title of the testator—That these circumstances, and his being unable to make sales for money, or for ready pay of any sort, rendered it unjust that he should be compelled to pay compound interest to the heirs, for whose benefit he has taken upon himself a heavy burden and great risk in point of property—That the executor ought not to be treated as trustee of what he has re-sold and not of the rest. The heirs should be compelled to affirm or disaffirm the sales *in toto*. The lands bought in by *Hapgood*, and remaining unsold, are of little value; much less than they cost. He purchased in with a view to an average value, not regarding, or even knowing, the comparative value of each lot. It would do injustice to compel him to account for these at their cost, and account for the amount the best and most saleable lots were sold for. He is willing to deed to the heirs, or have the whole sold at auction for their benefit; but he is unwilling to account in selected parcels, as the heirs now contend.

HUTCHINSON, J. delivered the opinion of the Court.—This case has been sent to commissioners to take the account of the executor, and they have made their report to this Court; in which they present the accounts in various items of debt and credit, naming which they allow, and which they disallow, and assigning their reasons for such allowances and disallowances, and reporting a balance due from the said executor, without including any interest, of eight thousand, one hundred and seventy-three dollars, and fifty-three cents. Numerous exceptions are filed to this report by each party, embracing different items; and, to some decisions both parties have excepted. These must be noticed and disposed of in the most concise form that can be adopted; as both parties are here from another state, awaiting the decision we now make.

One question hardly forms a separate exception by either party, and yet it is litigated by both parties in reference to its effect upon several items in the account. I allude to the question about

Essex,
July,
1829.
───────
Hapgood.
vs.
Jennison et al. the domicil of *Jonathan Grout*, the testator. We feel under no necessity of deciding this question. It seems the testator's family had long lived in *Petersham*, in the state of *Massachusetts*, and re-sided there at the time of his decease; that he had lived in the probate district of *Essex*, in *Vermont*, most of the time for several years before his decease; that he died at *Dover*, in the state of *New Hampshire*; that *Hapgood*, the executor, proved the will in *Massachusetts*, considering that his domicil, and produced a copy of it to the judge of probate here, as the ground work of his proceedings, in the exercise of jurisdiction over the property of the testator in this state. He came and acted under the pro-provisions of our statute. He came conceding that the primary jurisdiction was in *Massachusetts*, and requested the court, here, to exercise a secondary jurisdiction, to aid him in the settlement of the estate of the testator, so far as the same was within this state. By these proceedings he has decided the question so far as concerns the probate court here. By these he has rendered himself liable to account in *Massachusetts*, and have the residue of the property, after debts and costs are paid, distributed there. Thus we shall consider the case, so far as any importance attends it, in our decisions.

Many of the allowances reported stand without exceptions, and the exceptions to some others are abandoned. All these will be brought together as proper allowances, with no particular notice of each.

The third exception of the appellants is overruled. The commissioners report that no greater sum was paid, when payments were made in leather and shoes, than must have been paid in money. The heirs, then, were not injured by this mode of payment of debts due from the estate in cash.

The fourth exception of the appellants relates to No. 50, being the allowance for paying the taxes, assessed to defray the expense of surveying the 5th division. They object that too much was allowed. The executor, also, excepts because too small a sum was allowed him.

The whole charge is $768 93, and they have allowed him $584 71. The commissioners report, that the proprietors in 1809 voted a tax of $576 80 to defray the expense of surveying the 5th division of lands in *Lunenburgh*, and assigned the same on said division; and also, on the remaining common lands, $288 40. They put these in a train of collection in the hands of a collector. They also made the surveys, the expense of which exceeded the money raised, by $94 26. The proprietors' records, referred to, show, that the executor voted on fifty-two

of the seventy rights in town. And he was advised to pay the $94 26 without raising a tax for it. He did accordingly ; and the commissioners report that his portion of it, by a tax, would cost more than the whole without one.

Now it is important to ascertain the portion which the executor should have paid and charged to the estate ; for so much he ought to have allowed him ; and, if he paid beyond that, it should not be allowed him.

We approve of the payment, by the executor, of the $94 26. The proprietors owed it, and the portion belonging to the estate to pay would have been over five sevenths of it ; and the remainder must be less than his portion of the expense of a tax. Further, the commissioners report, that the sum charged by the collector for his bids, &c. was, $654 34 : add said $94 26, and it makes for him to pay, $748 60, being a less sum than the portion on said fifty-two rights. They then find to be deducted $20, relinquished from the bids, and $34 60, that his bids exceeded the amount that appeared to be not redeemed. This they presume was paid back by persons redeeming. They, therefore, correctly deduct, from                     $748 60
said $20, and $34 60, being             54 60

Which leaves, that the estate should have paid,   -   $694 00
But they have allowed him only     -   584 71

Leaving disallowed,   -     -     -     -   $109 29
This they disallowed because they find that it was paid in the same services for which he was paid in another way. This was a good reason for their disallowance. For if it were so, the collector had received nothing for that sum. The commissioners also find that $9 36 was included by the collector, obviously by mistake. This they seem not to have deducted, in finding the sum they allowed. Now we find that this $9 36 makes a part of a receipt of $110 54, given by *Peter White* to the executor for that sum allowed him by the proprietors, and paid him by the executor. This was as good as a bank note with which to pay the collector. It does not appear why that receipt should remain in the hands of the executor. It is probable, however, that he had before employed *White* to assist in the division; and, when he had paid *White*, treated it with the collector as services done by himself, and kept the receipt ; and the collector, knowing the services were done, allowed it in that shape. This would reconcile the whole with what ought to have been done ; while it is wholly incredible that the collector should have allowed the executor, in payment of his taxes, over one hundred dollars for services for

Essex,
July,
1829.

Hapgood
vs.
Jennison et al.

which the proprietors were not his debtors; and that he should actually pay nearly the same sum to *White* for an account allowed by the proprietors, and obtain his receipt, and yet not bring it forward, nor have any benefit from it. It appears clear, whether the collector or commissioners called it by the right name or not, whether it were services or payments, that *Hapgood* actually paid of those monies, which he as executor was holden to pay, the full sum he now claims; and, by such payment, he procured a proper receipt from the collector. Therefore, to the sum allowed upon this charge, No. 50, must be added the said receipt of $110 55.

Both parties except to the report upon the claim of a *per cent.* upon notes collectable only in stock, grain, &c. They have allowed twenty *per cent.* upon a gross sum of fifteen hundred dollars. The executor claims twenty-five *per cent.* upon about $2,400. We overrule both exceptions. The executor appears never to have kept any account with a view to this particular item of charge. He kept no exact minutes of the sums received in such articles; nor of the dates of reception; nor of the expences of converting into money; nor of the time that any sum received no increase by interest. And the commissioners report the further uncertainty of a correct separation of such payments, belonging to the estate of the testator, and those belonging to *Hapgood*. Should we treat the schedule marked C and accompanying affidavits as evidence in the cause, instead of grounds for a recommitment, and should we consider all the interlineations as proved correct, this difficulty would not be greatly diminished. It would still be uncertain, whether a greater sum was paid in those articles than estimated in the report. There was testimony about the expense of collecting the stock notes, which were eventually paid in money. This expense must have been the same if the notes against the same men had been payable in cash. Should we alter the amount estimated, we should be as apt to get farther from the exact sum as nearer to it. The *per cent.* allowed is low enough: but it should be rather low than high, as the executor might have had it exactly correct, by keeping minute accounts of sums, dates, expenses, &c. The tenth exception is taken to the allowance of too large a sum for the personal services of the executor; and for allowances at a period after the estate might have been settled.

The commissioners report that all the services, for which they have allowed him, were faithfully performed, and expenses incurred in settling the estate.

Upon this exception, and, also, upon the subject of interest, the counsel for the appellants urge the court to consider the neglect of

Essex,
July,
1829.

Hapgood
vs.
Jennison et al.

the executor to close a settlement, and what they deem his fraudulent management in the business, as reasons for a disallowance of a great portion of his claim for services and expenses; and for charging him with compound interest for the monies in his hands. As proof of the fraud, the verdict of a jury in *Massachusetts* is read to us.

There is no doubt but the estate might have been settled in two or three years from the decease of the testator. That is, the executor might have sold property enough to pay the debts, and caused a distribution of the residue among the heirs; and, by our statute, if any heir had petitioned the judge of probate to have his portion of the estate assigned him, the judge would have felt it his duty to have crowded the executor to a settlement for that purpose. None of the heirs thus petitioning, furnishes some evidence that they were satisfied with the delay for many years. The facts reported by the commissioners furnish strong reasons why they might not so wish to hasten a settlement of the estate, as to have the lands in *Lunenburgh* partitioned among them. They must have felt doubtful about many of the titles: auction sales for taxes, &c. were supposed to be adding strength to these titles. The lands were chiefly uncultivated at the decease of the testator: many of the lots were of poor quality. The heirs would not probably have wished to enter upon these wild lots themselves; surely not on many of them: a sale must have been their object. The executor assumed upon himself a great risk, in pursuing his administration in this state in the way he has. We discover no movement of his administration, in this state, that could have been intended for his own benefit, and to the injury of the heirs. His having two bidders, bidding upon each other, and he liable to take their bids off their hands, and charging each to bid high, must either prove him insane, or else very zealous to promote the interest of the heirs, by causing a sale at a high price; while he might be liable to pay that price. At his settlements in *Massachusetts*, next succeeding each sale in this state, he made an accurate return of the sales, charging himself with the amount of the bids, the same as if third persons wholly had been purchasers.

The verdict found in *Massachusetts*, and read in evidence, finds fraud in the executor's settlements and administration generally; but stating no particulars of the fraud. That does not necessarily attach to his proceedings in this state. They may not have found it in these: if they did, they must have inferred it from neglect only, or must have heard testimony not presented before this Court. It may not be amiss, here, to observe a word in reference to the great error in the settlement of 1817, in *Massachusetts*,

ESSEX,
July,
1829.

Hapgood
vs.
Jaunison et al.

where the executor charges for paying all the largest debts in the list of claims, and then takes an order for the payment of a dividend upon the same claims. It is not possible that he should do that, with the intention to injure those concerned, and yet with a prospect that the same might pass undetected by the register, when he should make his record. The allowances, which show the necessity of a dividend, must surely be recorded. These show payment of the principal claims, (one of above $1300) and these are all to be written over, and were so, in striking the dividend. If it were possible that the register should strike the dividend, and then record that and the allowances, without discovering a mistake so apparent, it was too improbable to leave a suspicion, that the executor, with design, acted thus improperly, in expectation of its remaining concealed. The mistake, at the outset, of above $3000, carries with it no such explanations ; and may have had its natural influence upon the jury, without any explanation.

Upon every view connected with the charges for personal services and expenses, though we might not hit upon the exact sums allowed by the commissioners, nor be exactly agreed among ourselves upon some items, we overrule the exceptions, and allow the sum reported. In this decision, we approve the grounds the commissioners adopted to ascertain the period of a rest in those charges. Every thing seemed ripe for a settlement in the fall of 1814, except that some of the payments for lands sold, had not become due; and that may more properly be considered in fixing on the period from which the executor shall be charged with interest, than in postponing the time of settlement ; especially, as the executor has made himself debtor for the amount of bids at his sales ; indicating his election to treat the securities as his own, and at his own risk.

The eleventh exception of the appellants is taken to the disallowance of the gains and profits, made by the executor in the resales of lands, bought in by him, at the sales in 1814. The heirs have made their election to consider the executor as their trustee ; and, under this election, they call upon him to account for the avails he has received on his re-sales of said lands, and to account for those unsold, of which the title remains in him, at the price for which they were sold at his sale in 1814.

We entertain no doubt of the right of the heirs to make their election, whether the executor shall be considered as a purchaser, and pay them the amount of his sales, or as their trustee, and account for the avails as they are, at the time when the election is made The matter of greatest importance; and, perhaps, of the

Essex,
July,
1829.

Hapgood
vs.
Jennison et al.

greatest difficulty, under this head, is, to ascertain how the subject ought to be considered in point of fact. Whether the sales and purchases and re-sales of each lot shall be considered as independent transactions, and the executor liable to have the election of the heirs apply to each lot, in a separate view, as the appellants contend ; or whether the whole must be considered as an entire trust, and the accounting of the executor be for the entire trust property, as the whole is when the account is taken, as contended by the appellee.

If the appellee had made a single purchase of an entire tract of land, say one thousand acres, at a given price by the acre, and then had sold individual lots of the best quality, for a larger price by the acre, and was called to account for the whole as trustee, no court of equity could ever deem it just to decree, that he should render an account of these sales, without also considering him trustee of the parts that remained unsold, and having proper reference to the comparative value of the same. In the case before us, the lots appear to have been sold separately ; and in nothing else, perhaps, does there appear any ground to compel the executor to account otherwise than as for an entire trust.

After the decease of the testator, all his wild lands in *Lunenburgh* were appraised as so many lots of after division land ; and appraised as of equal value. That is, they were appraised at what the appraisers considered to be their average value. This was well enough ; for their entire value was the only matter of importance at that appraisal. All the witnesses represent quite a diversity in the value of the wild lots, included in the late appraisals.—The facts reported fully warrant the conclusion, that the executor employed his agents to bid, not with a view to become owner of particular lots, the value of which he had previously ascertained, but to be sure and make a sale profitable for the heirs, at the risk of becoming owner of many lots, and without any view to their comparative value.

For the purposes now under consideration, the whole must be considered as an entire purchase by the executor ; and the accounting must be of the whole in a consolidated view. In this we are perfectly agreed. The executor must not be compelled to pay to the heirs his gains in the lots sold, without being made good if any of the lots that remain unsold are of less value than the sum they cost him. In coming to a result upon these principles, the commissioners have heard witnesses, and reported the testimony of sundry witnesses who differ from each other in different degrees, from one dollar an acre to a few cents, merely, an acre, of some lots ; and their result is that forty-five cents an acre is

Essex,
July,
1829.

Hapgood
vs.
Fennison et al.

not far from the present average value of what remains unsold. They also report what we do not discover to be incorrect, that, if forty-five cents an acre be a correct average value, it is immaterial whether the account be stated with the items of gain and loss throughout, or the appellee be made chargeable with the amount of sales as he charged himself. Both would produce the same result. After a full consideration of the facts and evidence reported by the commissioners, and viewing, on one hand, what we may hereafter notice about the uncertainty of title, and the quality of the lands as described, and the little value of any timber upon the land ; and, on the other, the prospect that taxes upon the land will,in future,be less frequent than heretofore,and that whatever value there is in the land must, in time, be rather gaining than losing, and considering that most of the lots, though back from Connecticut river, are not more than five or six miles back, we consider that we cannot better satisfy ourselves at any value, than at forty-five cents an acre, as named by the commissioners.

This being decided, the two ways of accounting coming also to the same result, and that adopted by the commissioners being the most simple and easy of computation, we have adopted the mode by them reported, and overrule this exception ; and leave the account to stand at the amount of the sales.

The appellee's second exception relates to the nos. 14 and 17 disallowed by the commissioners. They were charged as paid to *Azariah Webb, jun.* for taxes, April 23d, 1808,          $8 63,
and paid *Samuel Gates* for do. April, 24th, 1808,          6 55,

The amount is          $15 18

The commissioners assign no reason for this disallowance.— They only say disallowed, without exception. There must have been some mistake, or misunderstanding. The accounts and vouchers seem to support these items as fully as those of the same date allowed by the commissioners. That sum is to be added to the sum reported.

The third exception of appellee is overruled ; the subject matter being properly referred by the commissioners to the jurisdiction in *Massachusetts*. It is for paying printer in *New-Hampshire,*for publishing the notice issued by the commissioners in *Massachusetts*.

The eighth exception of the appellee is taken to the disallowance of certain articles of personal property, appraised at $50 50, claimed as having been sold to*Samuel Gates* in part payment of a debt due him from the deceased. The commissioners assign their reasons at length for not allowing this claim : while the ex-

Essex,
July,
1829.

Hapgood
vs.
Jennison et al.

ecutor contends, that this property was delivered to said *Gates* before he presented his claim, before the commissioners in *Massachusetts*, and this payment was deducted from his claim of about $83 12, before they allowed the balance of $39 10. The commissioners do not give credit to this statement; and that, principally, because the deduction of this payment would not leave so large a balance; and they seem to conjecture that this $50 50 went in payment of some other demand. This reasoning is not wholly satisfactory, especially as there is no intimation but that the payment was made for something; and none of any other demand, upon which it might have been paid; and no intimation of any other payment that would so reduce said *Gates'* demand. We may add to this, that the deposition of said *Gates*, which makes a part of the testimony in the case, expressly shows that a book account of several dollars was also presented before the commissioners with his other demand. This they have not noticed in their report, and when noticed, is calculated to remove that discrepancy in sums which created their difficulty. This sum is allowed, and must be added to the report, - $50 50

The twelfth exception of the appellee relates to the allowance against him of the amount of sales of 1808 and 1814. The appellee contends, that he is entitled to further deductions for lands, to which the testator had no title, if nothing more.

We have already said, in treating of the advances in the re-sales, that the heirs have a right to affirm the sales, and treat the executor as a purchaser, or to treat him as holding in trust for them. His taking the titles to himself is not the correct way to purchase a trust estate; and, having done so, the executor can set up no claim to be treated otherwise than as a purchaser. Moreover, his making his returns to the court of probate in *Massachusetts* soon after these sales, and rendering his account, in which he made himself debtor for the amount of these sales, was giving notice to the heirs, that they might consider him as the owner of the lands; and as indebted to the estate for the amount of the sales made by the probate orders. They, then, might well omit any exertions to make sale, or get persons in possession under them : for, they had nothing in these lands to sell; nothing to possess. All remained at the risk of the executor, who thus became owner. Yet, before they have ratified the sale, by receiving the pay of him as a purchaser, their election remains, whereby he is called upon as trustee.

After what we have already said, it follows, that the principles of this allowance are correct. Yet, if all the deductions are not made, which ought to be, on account of lots that are gone by adverse claims, the same should now be made.

Essex, ·
*July,*
1829.

Hapgood.
*vs.*
Jennison et al.

The titles of the testator, to the several rights he claimed, must have been, at best, of a dubious character, if tested at an early period. His deeds of what are marked in the table, furnished with the report, with the letter T, are so nearly of a date, about 1765 and 6, and acknowledged so nearly at a similar period, about the year 1785, it casts over them a suspicion of unfairness in their creation. Some of them being witnessed by only one witness, must have arisen from a supposition that the existing laws required no more.

The title of the testator to the *Hazen* rights, it seems, commenced with his own vendue : and the objections reported to this vendue would appear formidable, if raised before the existence of after circumstances now disclosed. After the production of the probate records, newly discovered in the estate of *Page, Buckman's* title to the testator is not so defective as at first appeared. It must be good in equity against the heirs of *Page.* The avails having gone for the benefit of the creditors of *Page,* the heirs would not be permited to set up so dormant a claim, as any that remains in them ; at least, not without refunding the money paid for the purchase by the testator, with interest.

With regard to all these titles it may be observed, that, whatever may have been their defects, and however suspicious their characters, at their origin, the testator claimed to own the lands conveyed by those deeds, and was permitted to act and vote with the proprieors, on the strength of them, in all the proprietors' meetings, and raising and collecting taxes, till his decease; and his executor has exercised the same right, till his sales ; and no proprietor has interfered to prevent this, with the few exceptions noticed by the commissioners. This, at once, furnishes very strong presumptive evidence, both of the genuine nature of the testator's deeds, and of the total abandonment, by the original proprietors, of all the title they might have to those rights. If we add to this the numerous vendue titles of the same lands, placed upon the records, at least, showing a claim of title against the original proprietors, and perhaps a good one, there is very little probability that any further claim will ever be made against the title the executor now holds. And he has held this title in himself too long to claim a deduction, where there is no possession destructively adverse to his title.

The commissioners have deducted from the account against the executor the purchase money of all the lots upon which adverse possession was shewn so early as to divest the title of the testator, prior to the sales by the executor, in 1814. That is allowing him from the fall of 1807, till June 1814, to become ac-

Essex,
*July,*
1829.

Hapgood.
*vs.*
Jennison et al.

quainted with the titles, and eject those who were in adverse to his title. If possessions, then existing, were afterwards suffered by him to grow into an adverse title, and that while he was the only person who could *oust* them, there is no great hardship in his bearing the loss. Happily, however, there are but three or four lots, or parts of lots, that come within this description; and these stand against the executor at about sixty or seventy dollars. From the facts reported, we discover no good reason for deducting these. The report upon this subject is confirmed.

The seventeenth exception of the appellee is taken to the disallowance of sundry items of his account, amounting to $123,14, being his expenditures in a suit brought by him against *Hayward* and *Snow*, to gain possession of a lot of these lands. This was an action of ejectment, decided against the executor; and the commissioners have deducted the value of the lots, as being lost by adverse claims. They have disallowed the costs of prosecuting the action. It is difficult to reconcile these two decisions. If the land was lost in any other way, than through the want of title in the testator, the executor should sustain the loss; and not the heirs. If it was lost through a failure of title in the testator, the executor ought not to sustain the loss, either of the land or the costs of trying the title. Hence, from a suggestion to the parties by the court, upon this subject, the papers are produced that were used upon the trials, sufficient to convince the court, that the failure of recovery was through want of title in the testator ; or rather in the executor, after all the vendue titles obtained to this particular lot. This sum is, therefore, allowed, and must be added to the account     -     -     -     -     $123 14

The item of $46,01 is reported by the commissioners to stand upon the same foundation, it being the costs in the suit vs *Olcott*,     46 01

Making addition of     -     -     -     169 15

The twenty-fourth exception of the appellee is allowed, being to correct a mistake in carrying out the amount. This adds to the executor's account     -     -     -     $10 00

The second exception of the appellants is allowed, being payment of taxes in *New-Hampshire*, being $70 34. This must be added to the balance in the report. Because it should be carried before the probate court in *Massachusetts*,     -     -     $70 34

This also disposes of the executor's thirtieth exception, for not making him accountable here for cash received at *Dover*, in the state of *New-Hampshire*. The commissioners correctly leave that to be settled in *Massachusetts*.

Essex,
July,
1829.

Hapgood
vs.
Jennison et al.

The 26th exception of the appellee is also overruled. The facts reported are that the notes claimed by the executor as uncollectable, were taken to himself on his sale of lands, and are at his own risk.

The twenty-seventh exception of the appellee is also overruled. The executor has not paid the demand, though it accrued in the life-time of the testator. It is reported as rejected, because not paid.

The twenty-ninth exception of the appellee is too general to be noticed ; and the only item particularly named is amply disposed of under another exception.

The twenty-second exception of appellee relates to the disallowance of No. 137, on book B, being $134 06. The commissioners assign as a reason for disallowing this item, that it is for expenditures in the present suit. We find, on recurring to the vouchers, now before the commissioners, that this is true in part, but not in whole. $44 06 of this item were for expenditures in the suits against *Hayward* and *Snow*, and *Olcott*; and should have been classed with, and added to, the sum allowed on the 17th exception of the appellee. This sum is, therefore, allowed and must be added to the executor's account,  -  - $44 06

Having thus gone through with the exceptions of both parties, we proceed to bring the varied items together as follows :

The balance in the hands of the executor, as reported by the commissioners, on page 53d,  -  $8,173 53
To this must be added the sum disallowed on the second exception of appellants,  -  - 70 30

Making the amount,  -  -  -  $8,243 87
From that sum we deduct the additional allowance on the charge No. 50,  -  $110, 55
Also allowed on appellee's second exception,  -  -  -  -  15 18
Also allowed on his eighth exception,  50 50
Also on his seventeenth exception,  -  169 15
Also on his twenty-fourth exception,  -  10 00
Also on his twenty-second exception,  44 06  $399 44

Which deducted leaves the balance  -  $7,844 43
On that sum we cast interest at six per cent. from the first of June, 1815, to this time, amounting to  6,675 56
Amount of balance and interest,  -  -  $14,519 99

Various facts reported have induced the Court to cast the interest as above. The great improbability that the avails of the

sales of June 1st, 1814, were received to any considerable amount, under a year, and perhaps not in money then; and the further probability, that some will never be paid, have induced the Court to commence the cast of interest one year after that sale.

Essex,
July,
1829.

Hapgood
vs.
Jennison et al.

The consideration that many of the lands remain unsold by the executor to this time, reported as wild lands from which no profit has accrued; the frequent taxes he has been obliged to pay since his purchase; the remaining uncertainty of some, at least, of the titles; the improbability of any future sale for cash, for many years; and many other circumstances connected with the ownership and care of lands situated like these, have induced the Court to allow six per cent. interest only. Had it been a monied estate, instead of wild lands, and the money had gone into speculations, we should not have hesitated to cast compound interest, so far as to make annual rests during the whole period.

The clerk of this Court must certify this decree to the court of probate in this district, according to the statute; whence it may go to *Massachusetts* if the appellants choose to take it there, as we presume they will.

The costs of this appeal are taxed and allowed at the sum of $301 72, for which the appellants are entitled to execution from this court forthwith.

Furthermore, as the sale of the real estate, in 1814, was not necessary to raise a fund to pay debts, as was then supposed, and as the titles, on that account, may prove defective, the heirs of said testator must quit to said *Hutchins Hapgood*, his heirs and assigns, all their right to the lands embraced in his return of the sales made in June, 1814, before they have any benefit from this decree, except as relates to the collection of their costs.

*Paddock* and *Cushman*, for appellee.
*Bigelow* and *Fletcher*, for appellants,